and his official capacity as Secretary, United States Department of Health and Human Services, NL. Ms. Stenson for the Appellant, Mr. Biro for the Appellant. Good morning, Your Honors, and may it please the Court. My name is Kate Stenson. I represent the Appellant, Amgen. It is difficult to study drugs in children. Success is not guaranteed. So when Congress created an incentive in the form of six months of exclusivity to encourage drug sponsors to do those studies, it didn't require success. It required three things before a secretary had to accept the studies, that the studies were performed in accordance with basic science principles, that the studies were filed in accordance with the FDA's filing requirements, and that the studies fairly respond to the written request. Now, successful studies get the grand prize. They get a new pediatric indication. Ms. Stenson, is there a mootness issue lingering here? Hasn't Amgen's key patent expired and generics have been approved? Am I wrong about that? The key patent has expired, or one of them has expired. There have been a few generics that have been approved, but none of them is on the market yet. And our exclusivity period, if this Court agrees with our arguments, would run through September of 2018. So there's no mootness issue. The difference between successful studies, though, and simply fairly responding, I think is worth reiterating again. Successful studies get a pediatric indication, and that, among other things, enables a drug manufacturer to market a drug for children. They also get the pediatric exclusivity. When you say successful, you mean successful in the sense that the study tends to show that the drug is safe and effective for children? I do mean that, yes. Okay, so you're clearly right. The study doesn't have to be successful in that sense, but why doesn't the study have to be successful in the weaker sense of just yielding meaningful data one way or the other? It could be successful in the sense it proves that the drug shouldn't be used for children, or it could be successful in the sense that you get a good, valid study and the data is inconclusive. All of that would be helpful to the FDA, but none of it happened here. And all of that is not what the FDA described as the fairly response standard. So the fairly response standard that FDA articulated in all three of its administrative decisions is that you either have to meet every single term of the written request, or you have to produce what the FDA called meaningful labeling across all age groups and uses. And to your question, Judge Katsas, inconclusiveness was not enough. If you look at Joint Appendix 709, which is the third letter of denial, the last phase of review, the culminating statement about what meaningful labeling means is IE, not EG, but IE, studies led to a conclusive finding, either positive or negative, for each age group requested in the written request. That is the FDA standard that they are holding us to, and it cannot get comfortably packaged within fairly response. Do you have a quarrel with the two-pronged standard that they've articulated on appeal? Well, yes, the first quarrel being that they... Meet the objectives, meet the terms of the study, or meet the objectives by providing clinically meaningful information. I understand your argument that's not what they did below, but... But I'm asking, suppose they had. Would you still be arguing that that's outside the bounds of reasonable interpretation? I would, because of what FDA described clinically meaningful labeling to be. If you look at Joint Appendix 703, clinically meaningful, IE, useful to practitioners, public health information related to the use of the drug in pediatric populations, as expressed in the drug's labeling. So the fact that FDA is receding from its standard actually suggests that it's not really receding from its standard. And in all events, the standard that brought us on appeal is the standard the agency articulated, not the government. Sorry, I think you just restated your argument that they've changed standards, which we'll get into, but I'm trying to focus on... You asked me whether I had a quarrel with the current standard. My first quarrel is procedural. But my second quarrel is that even though they have recast the standard, this formulation doesn't appear anywhere below. If they are talking now simply about clinically meaningful information, the place that we would look to discover what that means is back into the record. What has FDA said they mean when they say clinically meaningful information? And it's that quote that I just read to you, which ends with, as expressed in the drug's labeling. So the fact that they've taken out labeling from their current formulation doesn't mean it's not still in there, it's just hidden. All right, so sorry, where is that you really want to talk about whether they've changed the standard? So, sorry, you're on 703? I'm on 703, yes. I thought that was... Which paragraph? Is the paragraph beginning in the middle of Joint Appendix 703? With when or occasionally? I'm sorry? With the paragraph that begins with when or the paragraph that begins with occasionally? The paragraph that begins when. Right, so there they say, the key sentence to me is towards the middle of the paragraph where they say, in addition, where the specific terms of the study are not met, that the information produced is clinically meaningful across all age groups, i.e. where the FDA can apply its scientific expertise to determine that the objectives of the study have been met, the agency will consider the sponsored studies to have fairly responded. That sounds to me a lot like the standard they're defending in the red brief. I'm going to go back up to the very top. Okay. This is the definition that I just read to you. So this is clinically meaningful and what that means in turn to FDA. Clinically meaningful, i.e. useful to practitioners. Okay, sorry, go back up to where? Back up to the very top of that page. Oh, in implementing? In implementing. Okay. Congress's goal of obtaining clinically meaningful, i.e. useful to practitioners, public health information related to the use of the drug in pediatric populations as expressed in the drug's labeling. Okay. So all of this, of course, is setting aside the elusiveness of the standard compared to how it was articulated below. And I want to make clear exactly what the board, the Pediatric Exclusivity Board, based its decision on below, because it wasn't this. If you look at Joint Appendix 643, which is the first of the three administrative rulings, what you'll find on Joint Appendix 643 is, if the totality of safety information Amgen submitted had provided an appropriate safety assessment in younger children and supported a label description, it would have been found to have fairly responded. That's the first decision. Second decision, Joint Appendix 675, based upon the lack of meaningful labeling information, the board determined that Amgen did not fairly respond to the written request. Third decision, Joint Appendix 709. That's the chart that I mentioned before, where the agency describes meaningful labeling, i.e. studies led to a conclusive finding, either positive or negative, for each age group requested in the written request. Those are the three agency-articulated bases for finding that Amgen, falling short in one respect, did not fairly respond to the written request. But isn't the bottom line here that for the age group up to 6 years old, there wasn't sufficient data under the explicit terms of the WR? Or to basically reach any conclusions in human studies for that age group? Isn't that the bottom line? That is the bottom line, but it does draw upon one of Judge Katz's earlier questions as well.  It actually contemplates inconclusive results just like this. It requires that even inconclusive results go on the labeling. But that's not what FDA... Inconclusive results is different than not being able to complete the study. You can have a complete study that yields inconclusive results, or you can have a study that just doesn't get concluded, and therefore it's inconclusive. Right. The statute, though, doesn't distinguish between substantive inconclusiveness and procedural inconclusiveness. It says if you reach the end of the study and your data are inconclusive, even that goes on the label. But what FDA required of us is a conclusive finding of either safety or not safety before it would award exclusivity. Now, we are not... Why is that? I mean, you make a reasonable point that there's some muddiness here to the extent they are mixing and matching the exclusivity part of the statute with the labeling part of the statute. But when you go to the labeling part of the statute,  if the study shows safety and efficacy, that goes on the label. If the study shows the opposite, that goes on the label. And if the study is inconclusive, that goes on the label. So even if they did sort of this odd cross-reference, what's the harm to you where the labeling provision seems to say that any scientifically meaningful information, including a valid study that's inconclusive, goes on the label? Well, to be clear, the information from our study went on the label. If you look in the joint appendix starting, I think, at 587, it's the post-studies label. And the information about our study, how many subjects were studied, for how long, what happened, that the results were inconclusive. All of that is on the label. But the point here... This specific study, they didn't like the one which had only four respondents instead of 15? Each of the studies, each of the three studies that were requested and required to go into the label were mentioned on the label, yes. But with respect to the statute talking about inconclusiveness, the reason I think that's important is because you can't set aside inconclusiveness for purposes of labeling and require conclusiveness for purposes of pediatric exclusivity. There's simply no warrant. Ms. Stegman, we're talking about study three. The word inconclusive may not capture it. It wasn't done. It wasn't as if the study was done and they weren't certain of the results. The criticism is that there just weren't enough young children in the study to know the information they need to know to decide whether to go forward. That was indeed the criticism. It was exactly the criticism that the FDA leveled at Merck in the Merck case. There, Merck was supposed to study about approximately 35 was the written request, 35 women. It studied five. The FDA denied it exclusivity. Merck took them to court. The FDA said close enough isn't good enough for fairly respond. And Judge Robertson said, fairly respond plainly does not contemplate that every term of a written request must be satisfied. Fairly respond means if the studies as a whole answered the request, that's a fair response. So the fact that the studies weren't completed to both of your questions doesn't mean that they didn't fairly respond to the written request when you take these studies as a whole. There were hundreds and hundreds of pages of studies that were submitted to FDA. We did fall short in one request, in one respect. We satisfied FDA in every single other respect. And Merck made exactly this point in saying that that is a fair response. Now, FDA claims deference, and I want to make an important point on this. This does not warrant any Chevron deference. This is an unpublished, unpublic, informal adjudication. It doesn't have any of the indicia that this Court has looked at before when it comes to awarding Chevron deference. It's very similar to the Fogo de Chao case in that respect. The FDA cases that the government cites all are backed by some kind of public process, either a regulation. What about Mylan? Isn't Mylan regulatory letters of the kind at issue here? It was a letter, but Mylan specifically says it relied on the regulations and two published decisions. So that was my point of saying that even the letter rulings that they point to are backed by something else. They are either backed by a longstanding interpretation, a regulation, or in some of the cases, Novartis and Teva publicly docketed, publicly commented upon findings. So this is, I think, an unusual case when it comes to FDA because normally when you get an FDA challenge, there is something behind it. There's a regulation or there's a citizen petition or there's a public process. Here there is none of that. The unpublished nature cuts in your favor. I'll give you that. But, I mean, Mead is sort of open-ended on what counts or doesn't count, and cutting in the agency's favor is a sense. You look at this entire thing and the decisions are extensive. There's this back-and-forth process. There's a rulemaking record. It doesn't have the feel of some minion in a field office dashes off a two-page Dear Colleague letter. It feels very different from that. Judge Katz says there is no rulemaking record. There is a record good for this participant only that wouldn't even have been public were it not for this litigation. There was an iterative process, as the FDA calls it in its brief, back-and-forth between this party and the FDA. It was exactly the same iterative process in Fogo de Chao. That didn't warrant any extra treatment or any extra deference due to the agency there. The question in Mead is, did the agency intend by this pronouncement for it to carry the force of law? And when you have a pronouncement that is backed by something, like a regulation or like that public process, then the answer is almost always yes. But when you have a pronouncement that is non-published, non-public, informal, non-precedential, that doesn't satisfy Chevron. How do you answer their response to that, that a lot of these kinds of rulings are not published because they tend to contain proprietary information to benefit the drug companies? I think there's two responses. One of them is that proprietary information could be redacted, but the second is if they're not published and informal and non-precedential, then they just don't get Chevron deference. It's not a reason to give them deference. It doesn't count for anything in the Chevron inquiry. And if we are at Chevron step zero, then I think the answer is very clear, and if I may finish with a couple points. The first is there is nothing in that statute that talks about filing protocols, scientific protocols, and fairly respond, that warrants importing an entire labeling inquiry into the question of what fairly responds. There's an entirely different statute, Section 21 U.S.C. 355D, that in detail gives what has to go into a secretary or the FDA's finding of labeling. There's no support for the idea that that comes into the fairly response standard. The last point I would make is, even if this interpretation survives the whole Chevron gauntlet, you are left then with a significant fair notice question. And I would point you to General Electric, and I would point you to the Gates and Fox case that's cited therein, because in both of those cases, what the court ultimately found was, yes, this interpretation is tolerable, it's reasonable, but it was not available to the regulated party with ascertainable certainty. FDA doesn't even contest that this was publicly available. It says that we should have been aware of the framework. The only thing we were aware of, of course, was Merck, which said what I read to you earlier, and the public statement on the FDA's website that said, pediatric exclusivity is not tied to labeling, which is exactly what they determined here. If there are no further questions. Thank you very much. May it please the Court. Charles Bureau on behalf of the appellees. Now, the specific issue here relates to FDA's interpretation, application of the phrase fairly respond. There are a number of key important facts that are not at issue here that inform much of the case. First, Amgen is not challenging FDA's conclusions that its studies produced data that was insufficient to draw any conclusions, and that's the language that appears on the label. Again, there's a difference between having studies that are inconclusive, as Judge Wilkins pointed out, and having studies that just don't furnish enough data to make any conclusions. That labeling decision about not having sufficient data is not something that's at issue here. It's a subtle fact. How do you distinguish this from Merck? I recognize that was just a district court case. What FDA has done is taken the lessons of Merck, which had a specific ruling that FDA couldn't require that the only criteria used meet all of the terms of the written request. That opinion goes on to say that the FDA should look at the entire study as a whole and see if that is a fair response to the written request, and that's exactly what FDA has done here, is they've taken a look at the entire studies, study three here being the critical study, and applied a test to see if there were any meaningful results. The deficiency here is in study three, right? That's the problem. And what was it about study three that was deficient, that wasn't also deficient in the Merck case? Well, with regards to it was the number of finishers. But what FDA now does after Merck is take a look further at the study as a whole to understand what has been learned from the study and look to see if that produces clinical meaningful information. So it's not asking specifically for meeting all the terms of the written request. That's where it starts, because when the FDA puts out a written request, it works with the study sponsor to come up with this protocol, which it believes will get it the information it is looking for. So you're saying that in the Merck case, the studies were otherwise adequate and gave the FDA the information? I can't comment on how good the studies were underlying Merck. What happened was it was rejected, first for not meeting the specific terms of the written request. Later the FDA looked further at additional information relating to Merck, found that the written request had basically been met and was later awarded exclusivity on that. Am I right here that the problem here is with study three? Correct, yes. Your argument, I take it, is that it was so deficient that it infected the entire written response. Correct. The other three studies had met the written request, and so there weren't any questions about whether those studies would have qualified for pediatric exclusivity. Study three, with only four or 15 finishers,  And that's what went into the label. And the idea here is, under the statute, is the FDA is looking for information that goes to the use of the drug and may produce health benefits. And that's the language of the statute of when the FDA issues a written request. So it uses that language to look for actual information that provides a health benefit, that provides physicians with information about how they can use this drug. And that's what they expect back from the group. So suppose the study was terminated because there were a number of, let's just say, very adverse events, maybe a death or some other very significant adverse event. So the study is terminated early. Would the result be the same? Well, in something sort of catastrophic like that, or potentially if they're looking at the study protocols and it's just unworkable, there can be amendments. We have five amendments here, such that the written request can be changed to accommodate something like that. So that's the way that should be resolved, is by amending the written request rather than saying, well, what happened fairly responded to the written request that had been approved. I'm not sure I get your question. I think the idea is that if there is an indication that the study, because of adverse events here in Study 2 there was a death and it was ended, that it would be proper to say we'll amend the written request. But to the extent the study is possible, that it's going to still result in meaningful data. There wouldn't necessarily be a reason to alter the written request. If that answers your question. Back to Merck for a second. So the primary holding that you can't comply with all terms standard doesn't really hurt you here. But there's this further piece from Merck, which is the court's statement that disappointment with the data is not a sufficient ground for denying pediatric exclusivity. And that's potentially pretty broad. So how do you understand that statement? And why doesn't here they're disappointed with the data from Study 3 or whatever,  Why would that be an over-reading of Merck? I read the disappointment of the data relating to not finding a positive correlation that leads to specific pediatric use that can go in the labeling. Sort of the idea of not looking just specifically for positive data. Disappointed because a valid study shows that this drug just won't work for kids. That's how I read it. And I also wanted to stress that to the extent of, and this goes to the fair notice point, is that Amgen had been working with the FDA for over 10 years on this study. So there was plenty of time to discuss what the standards and the objectives were. But Merck was decided in 2001, 17 years ago. And so far as one can tell, there's no public statement of the two-part test or whatever else the commission's position might be in light of Merck. That seems a little troubling. Well, there's no specific guidance that's been given out. It goes back to what I was starting to talk about, sort of the process which makes this case unique from much of these other administrative law cases, which is the parties are working together on this. There should be clear expectations. There can be expectations shared between the two that these are the objectives of the study. And keep in mind that this is science here, and it's a clinical trial. It was run for a reason. And so the reason is to find some sort of answer to a question, whether positive or negative. And so the idea that FDA was expecting the objectives of a study to be met, such that the safety and efficacy of a drug can be described and evaluated, that there would be a requirement that there would be clinically meaningful information coming out of that as being an indication that the study met its objectives is pretty basic and almost goes without saying. There was, at least in September 2013, communication between the FDA and Amgen about whether what they had done up to that point had been sufficient or not. And at that point, FDA did, in very particular language, get back to them and explain that they had not gathered enough information at that point to support, to quote, that the study's current program was, rather I should say, the FDA did not believe that the current program was sufficient to inform the public on the safe use of SINIC L-sets and would not be adequate to support a written request. So at least to the extent that there's specific interactions, we can point to that, as well as just the general reading of the statute, which, again, goes to a very specific purpose, getting information that physicians can use. There's any number of indications that what the standard would be. How do you respond to the point about the arguably shifting nature of PROM2 on the question whether it requires clinically meaningful information in the abstract or something that's meaningful on the label?  Well, the three letters at issue are all very clear, and it even goes back after the decision in Merck. We can find letters going back to 2001 where the standard is set out. The standard hasn't changed, and the standard might be reworded in certain instances, but the material aspect of the standard hasn't changed, and it's to get clinically meaningful information from these studies. And I had thought that the paragraph in the middle of 703 tied that down pretty well and conforms to what you say in the red brief, but I have to say Ms. Stetson made a pretty good point that if you go up a paragraph, you see that clinically meaningful, the agency is using clinically meaningful to mean something on the label. Well, to be clear, these applications, well, let me take a step back. I think the district court explained it best when it said that, adopted our understanding of the standard as it has been set out and noted that whether there's clinical meaningful information, or rather, let me start again. If there's labeling, meaningful labeling, that is an indicia of whether the studies have produced clinically meaningful information. And what you see in a lot of the language, and Amgen and the district court quote some of the same language on that where the FDA letters are discussing that they consider whether labeling had been met. Again, consider can be used as an indicia. The three letters themselves all at the start start with very clear language and talk about if a study doesn't result in interpretable language, or I'm sorry, interpretable, if the study's not interpretable, i.e. if it doesn't have enough data, it's most likely going to be denied. So that's set out very clearly at the beginning of all three of these letters, that concept. Now, some of the language as we get in there gets a little bit muddy, but the bottom line is they are separate inquiries. The Orencia case... So is it the case, is the following legal proposition true, which is if there is a scientifically valid study on the useful safety efficacy of this drug for children that either points one way or the other or is inconclusive, good study, just the data don't resolve it, would that as a matter of law go on the label? Yes. Well, first off, to clarify, there is the section 355AJ, which means anything goes on the label. Yeah, that's what I was reading, and I would have thought that would lead to an argument on your side that doesn't really matter whether you said clinically meaningful or clinically meaningful on the label because everything that's clinically meaningful goes on the label. But I don't think your brief makes a point quite that crisply. No, no, no, it does not. And to the extent that it gets mentioned, we're parrying this idea that just because something is mentioned on the label, it automatically means it should have got pediatric exclusivity, which we would say is not the case because there is basically no bar to getting on the label under 355AJ. It becomes a question of whether that's actual meaningful labeling. And, again, referring back to the statute, the statute specifically asking for information that provides a health benefit, it can tell the physician what to do. So going back to the labeling point, Orencia is a study where FDA granted pediatric exclusivity. It didn't meet the terms of the written request. It did provide clinically meaningful information, but it did not lead to any new label change. So there are instances where that happens. Can I just make sure I understand your position? And if in this case they had actually completed with 15 subjects, study three, which was the number required by the written request, and basically the results of the study were inconclusive as to safety and efficacy, so it's your position that they would or would not have met the fairly respond standard? They absolutely would have if they had all of their finishers for that written request. Okay. So let's say they had 14 complete instead of 15 and still inconclusive results with 14. What would be the result? Well, it becomes a question, I think, of the specific analysis and then the data that comes in. To the extent you're talking about studies that garner enough data that can be analyzed and you can look, is there a connection between safety and efficacy here, and can actually inform a physician on how to treat a patient, then, yeah, it would be clinically meaningful information that would provide a health benefit for physicians and would still get exclusivity. How does the study with 14 versus the study with 15 subjects, how do they differ with respect to whether it's clinically meaningful results? I mean, it would, I think, take a specific dive into the evidence and the data. I mean, there is also this idea that the dosage on these children was very slowly going up, so you needed to look at that. So to the extent you need to make sure you understood how the drug was reacting, 15 data points isn't very much, and so if you have one less finisher it could dramatically change what the results were, particularly if we are talking about children who were titrated at sort of a different rate. I mean, there is some potential flexibility to amend the request if there is some reason to change it to 14 in this instance, but I think it becomes a very stack-specific sort of inquiry that's difficult to answer in the abstract. How is an entity to know at the beginning of the process, they get the written request, how are they to know what they need to produce in order to gain the pediatric exclusivity? The regime that you're describing seems to leave an awful lot of discretion to the FDA, and you're using, you've said repeatedly, it's case-specific. The written request set out specific objectives. Here it was to evaluate, and then once you're on that idea of, well, once we're going to take a look and say, did you evaluate this, can you describe the sort of safety profile, then it becomes a scientific discussion about how tight the statistics are and what sort of trends we can actually discuss and how robust the data is. As you set out on one of these experiments, again, it's science, and the FDA is working with the study sponsor to come up with a protocol that's doable, that a sponsor can actually get enough enrolled patients in, and the study sponsors at this point, as I was saying earlier, are often also still looking for an indication in meaningful labeling, and so they're going to be interested in trying to get as robust a data as possible. So the companies are working with the FDA. So if I'm the general counsel to the company, what's the advice I give them? They've gotten the written responses. What's the advice I give to them about what they need to do to make certain they gain the pediatric exclusivity? Well, it would be... Besides do everything the FDA tells you to do, right? Right. That was point number one was, well, in that regard, meet all the terms of the written request, and to the extent that there are starting to be difficulties with that, bring it to the FDA's attention to amend the written request if needed and to explain potential problems with the study and talk with the FDA about what they believe the sufficient amount of data is to be interpretable. And that's what typically happens in these cases. There's 40-some interactions that are just listed in the documents here. And on this record, at some point when it was discovered that there was going to be a problem completing Study 3, Amgen brought that to the FDA's attention, and the FDA, as I recall, refused a request for a meeting and just said kind of proceed at your discretion. Something to that effect. Am I right about that? Yes. That was in the very late stages. There was an additional meeting request after there had already been five amendments, and that one was refused as being... So did they make a formal request to amend the written request again? Right. There wasn't a proposed amendment 6. And the FDA refused that, and the merits of that decision is not before us. Correct. Not at appeal. And I think the background on his letters is just at some point, you know, the study needed to wrap up, and there hadn't been sufficient reason to reduce the number of completers. And keep in mind, I think one thing I wanted to close on just quickly is that this program has been immensely successful. It's 93% of people, 93% of studies end up finishing. And there is a quid pro quo here that happens, and what FDA is looking for is some sort of real information. That's what the statute asks. Just one more question following up on the label point. Did I hear you correctly that sometimes, for whatever reason, there are perfectly good studies that don't end up on the label? Is that right? Right. Okay. If that's true, then why isn't it a problem for you to the extent your articulation of the standard sometimes, in a muddy way, whatever, sometimes suggests that you need studies that will end up on the label? We're looking at the studies as not necessary but a sufficient indication. And so it's not a requirement to get the labeling, but it's looked at. And as the district court said, it's an indicia. And I think also the bottom line to keep... Sufficient but not necessary. Right, right. And so there's no indication that the inquiry stops at that point. And I think also just to keep in mind, to the extent we're talking about labeling, Amgen's submission here wasn't rejected because they didn't come up with labeling. It was rejected because they came up with insufficient data. Okay, great. Thank you. We appreciate your argument. How much time does Ms. Stetson have? We'll give you two minutes for rebuttal. Three quick points on rebuttal. One on Merck, one on Chevron, and one on meaningfulness. The Merck exclusivity was granted not because the FDA concluded that somehow five finishers out of 35 was more meritorious than four out of 15. It was granted because, this is what the FDA says at Joint Appendix 667, the agency followed the finding of the court to recognize exclusivity based upon the determination that Merck had substantially met the written request terms even though not meeting the exact terms. That's why Merck got exclusivity. On Chevron, government counsel talked a lot about the process in this case, but the process that triggers Chevron is a public process, not a lengthy, no matter how lengthy, iterative process between one regulated party and the agency. What gets you Chevron deference is a pronouncement that is intended to carry the force of law, and there was no such pronouncement in this case. Not even this decision would be public were it not for this litigation. Third, on clinically meaningful, I want to be very clear. The board based its decision, Joint Appendix 675, based upon the lack of meaningful labeling information. The board determined that Amgen did not fairly respond. I agree there's a lot of muddiness in those rulings. That is not muddy. The last thing I would say with respect to September 2013, Mr. Biro mentioned that there was an exchange at that point. There was. What Mr. Biro neglected to mention is that that is the meeting where Amgen put this question to FDA, do you agree that we should stop these studies? And FDA said, no, we disagree. We have learned a lot from the clinical data that you have collected during these studies. So the idea that the data that we produced, those hundreds of pages, were clinically meaningless, so meaningless that they somehow go on a label and they have no meaning whatsoever is a little bit difficult to take. Even inconclusive results are clinically meaningful. Physicians look at that label. They make decisions based on that label. They can look at the public studies that resulted from our studies, and they can make clinical determinations. So if we are in a clinically meaningful world, not tied to conclusive labeling, which was their finding, we submitted clinically meaningful information. If there are no further questions. Thank you very much. The case is submitted.
judges: Griffith, Wilkins, Katsas